# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-23829-MARTINEZ/Elfenbein

**UNIVERSITY OF MIAMI**,

  Plaintiff,

v.

**CANEUP LLC**,

  Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court on Plaintiff University of Miami's Motion for Default Final Judgment and Permanent Injunction against Defendant CANEUP LLC (the "Motion"), ECF No. [17].   The Honorable Jose E. Martinez referred the Motion to me "for a report and recommendation."  *See* ECF No. [21].  For the reasons explained below, I recommend that the Motion, **ECF No. [17]**, be **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

This case concerns two well-known trade, service, and design marks owned by and registered to Plaintiff University of Miami (the "University"): the word "CANES" and the orange and green "U" symbol.  *See generally* ECF No. [1].  "Since at least as early as 1965, the University, its athletic department, its many teams and organizations, and its campus stores" have used "the CANES trademark and service mark in association with multiple products and services," including "athletic entertainment services and clothing products" (the "CANES Mark").[1]  ECF No. [1] at 3.

---

[1] Because the University has obtained a clerk's entry of default, *see* ECF No. [13], the Court accepts as true its well-pleaded factual allegations, *see TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1298 (S.D. Fla. 2016), but not its conclusions of law, *see Surtain v. Hamlin Terrace Found*, 789 F.3d 1239, 1245 (11th Cir. 2015).

And "since at least as early as 1972, the University" has also used an "orange and green split 'U' design mark" (the "U Design Mark") for the same purposes. *See* ECF No. [1] at 3–4.  The University's association with the U Design Mark "is so well-established" that "the University is now often referred to as the 'U.'"  *See* ECF No. [1] at 3.

Because of "the University's success and the University's athletic teams," the CANES Mark and the U Design Mark "have been extensively featured on television broadcasts and in print and online media nationwide and around the world for decades," which has provided "extensive promotion" of the marks.  *See* ECF No. [1] at 3.  "The general public, alumni and fans of the University celebrate the University and the University's athletic program and teams by purchasing and wearing a wide range of" University-sanctioned "apparel and clothing products" that bear the CANES Mark and the U Design Mark.  *See* ECF No. [1] at 4.  "As a result of its long-standing use in interstate commerce," the University asserts that it owns "nationwide common law rights in the CANES Mark and U Design Mark."  *See* ECF No. [1] at 4–5.

The University has also registered both marks with the United States Patent and Trademark Office ("USPTO").  *See* ECF No. [1] at 4–6.  It registered the CANES Mark in 1996, noting in its application to the USPTO that it had first used the mark in 1965 and had used the mark in commerce since 1980.  *See* ECF No. [1] at 4–5; ECF No. [1-1].  It registered the U Design Mark as a service mark in 1993 and as a trademark in 2016, noting in both applications that it had first used the mark in (and had used the mark in commerce since) 1972.  *See* ECF No. [1] at 5–6; ECF No. [1-2].  Because of these registrations, the University asserts that it also "owns statutory . . . protection for each individual registration and for its 'family' of" CANES Marks and U Design Marks.  *See* ECF No. [1] at 5–6.  Specifically, it asserts that the USPTO registrations "provide[] incontestable protection pursuant to 15 U.S.C. § 1065" and "constitute *prima facie* evidence of the

University's exclusive ownership of and right to use the" marks.  *See* ECF No. [1] at 5–6.

The University's "decades of use," "widespread sales," and "extensive advertising" of the "products and services identified by" the U Design Mark and the CANES Mark have made the marks "well-known" such that they "are recognized and relied upon" by the general public, other universities and colleges, and all levels of athletics programs and participants both to "identify[] the University's products and services" and to "distinguish[] them from the products and services of others."  *See* ECF No. [1] at 7.  Indeed, the marks have become "synonymous with the University's goods and services."  *See* ECF No. [1] at 7.  As a result, the University asserts that the U Design Mark and the CANES Mark are "valuable assets" and "goodwill" owned by and "belonging exclusively to the University."  *See* ECF No. [1] at 7.

Despite the University's ownership of the U Design Mark and the CANES Mark, and its use of those marks on clothing and apparel, Defendant CANEUP LLC ("Defendant") filed an application with the USPTO in 2021 to register the word "CANEUP" for use on clothing and apparel (the "CANEUP Mark").[2]  *See* ECF No. [1] at 7–12; ECF No. [1-3].  Defendant's application notes that it is based in Broward County and first used the CANEUP Mark in (and has used the mark in commerce since) 2014.  *See* ECF No. [1] at 11; ECF No. [1-3].  Although Defendant's application explains that the mark it seeks to protect is just the "literal" word CANEUP in "standard characters, without claim to any particular font style, size, or color," *see* ECF No. [1-3] at 5, the pictorial "specimen" Defendant attached to the application shows the mark rendered in orange and green with a white stripe separating the two colors, *see* ECF No. [1-3] at 5, 9.  And some items on Defendant's website include a "stylized depiction of the CANEUP Mark

---

[2] In a Motion to Serve through Alternative Service, the University explained that it filed an opposition to Defendant's USPTO application, *see* ECF No. [6] at 2; ECF No. [6-3], which Defendant answered, *see* ECF No. [6] at 3 n.4; ECF No. [6-4].  The USPTO application proceedings are currently "suspended pending final disposition of" this action.  *See* ECF No. [6-8] at 2; ECF No. [6] at 3.

using" a "white, orange and green letter 'U'" while the other letters of the marks are a solid color, which emphasizes the gradated letter U.  *See* ECF No. [1] at 8–10.

The University asserts that by "depicting the letter 'U' in the CANEUP Mark in the exact colors as the University's colors and U Design Marks," Defendant "is implying an association between its CANEUP Mark and the University that does not exist."  *See* ECF No. [1] at 10.  It asserts that "Defendant's CANEUP Mark incorporates the majority of the" CANES Mark "verbatim and merely pairs it with the word UP, signifying raising or supporting something, such that the mark immediately conveys to the public" that "Defendant's products using the CANEUP Mark are licensed or approved by the University."  *See* ECF No. [1] at 10.  And it asserts that Defendant's products bearing the CANEUP Mark are "nearly identical" to its own products bearing the CANES Mark and the U Design Mark and use "the identical formative component of CANES and the singular of the" CANES Mark, "namely CANE."  *See* ECF No. [1] at 10–11.

According to the University, Defendant "indisputabl[y]" had "actual notice of the use and fame" of the CANES Mark "throughout the world and" in "South Florida where the University is principally located" and also had "actual and/or constructive knowledge of the University's incontestable rights in" the CANES Mark and the U Design Mark.  *See* ECF No. [1] at 10–11.  In fact, the University had "prior communications" with "Defendant's chief operating officer" in which he assured it that he "spent years on this concept with The University of Miami in mind" and that "CANEUP will be the new It's All About The U," statements the University asserts "demonstrate that Defendant's infringement of" its marks "was intentional."  *See* ECF No. [1] at 12 (quotation marks omitted).

"Because of the likelihood of confusion caused by Defendant's unauthorized use of the CANEUP Mark," the "University sent Defendant a cease-and-desist letter" in September 2023,

but "Defendant did not respond." *See* ECF No. [1] at 12; ECF No. [1-4].  The University then

filed this action, alleging four claims: (1) federal trademark infringement in violation of Section

32 of the Trademark Act of 1946, 15 U.S.C. § 1114; (2) federal unfair competition and false

designation of origin in violation of Section 43(a) of the Trademark Act of 1946, 15 U.S.C.

§ 1125(a); (3) federal trademark dilution in violation of Section 43(c) of the Trademark Act of

1946, 15 U.S.C. § 1125(c); and (4) trademark infringement under Florida common law.  *See* ECF

No. [1] at 2.

As relief for Counts I and II, the University asserts that under 15 U.S.C. § 1117, it is

"entitled to recover" all its current and future actual damages, "up to three times" the amount of

its actual damages, "Defendant's profits," and its attorney's fees.  *See* ECF No. [1] at 14–17.  It

also asserts that, under 15 U.S.C. § 1116(a), it is entitled to a permanent injunction.  *See* ECF No.

[1] at 14–17.  As relief for Count III, the University asserts it is entitled under § 1117 to "damages

in an amount to be determined at trial, profits made by Defendant on sales of its products, and the

costs of this action."  *See* ECF No. [1] at 18.  It also asserts that it is entitled under § 1116 and

§ 1125(c) to injunctive relief.  *See* ECF No. [1] at 18.  Finally, as relief for Count IV, the University

asserts that it is entitled to "damages in an amount to be determined at trial."  *See* ECF No. [1] at

19.

When the University was unable to serve Defendant after eleven attempts, *see* ECF No. [6]

at 2, the Court granted its Motion to Serve through Alternative Service, *see* ECF No. [9].  The

University then served Defendant by email and certified mail.  *See* ECF No. [10]; ECF No. [11].

When Defendant did not answer or otherwise respond to the Complaint by the deadline to do so,

the University filed a Motion for Entry of Default by Clerk, *see* ECF No. [12], which the Clerk

granted, *see* ECF No. [13].  As instructed by the Court, *see* ECF No. [14], the University then filed

this Motion for Default Final Judgment and included within it a Motion for Permanent Injunction, *see* ECF No. [17]. In the Motion, the University noted that, as of the date it was filed, it had incurred $24,852.00 in attorney's fees and $508.00 in taxable costs. *See* ECF No. [17] at 16.

## II.  LEGAL STANDARDS

### A.  Default Judgment Standard

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55 (a). After the clerk enters a default, the Court is authorized to enter a final default judgment if the party seeking it applies for one. *See* Fed. R. Civ. P. 55 (b)(2); *Surtain*, 789 F.3d at 1244 ("When a defendant has failed to plead or defend, a district court may enter judgment by default.").

"A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact' as set forth in the operative complaint." *TracFone*, 196 F. Supp. 3d at 1298 (quoting *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009)). But the defendant "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Surtain*, 789 F.3d at 1245 (quotation marks omitted). And a defendant's default does not automatically permit the Court to enter a default judgment: "Because the defendant is not held to admit facts that are not well pleaded or to admit conclusions of law, the court must first determine whether there is a sufficient basis in the pleading for the judgment to be entered." *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019); *see also Surtain*, 789 F.3d at 1245 ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered." (quotation marks omitted)).

The Eleventh Circuit has "interpreted the standard" for evaluating whether a sufficient

basis for default judgment exists "as being akin to that necessary to survive a motion to dismiss for failure to state a claim." *Surtain*, 789 F.3d at 1245; *see also Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim."). Of course, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Surtain*, 789 F.3d at 1245 (quoting *Iqbal*, 556 U.S. at 678).

### B. Trademark and Unfair Competition Law

#### 1. Federal Trademark Infringement (15 U.S.C. § 1114)

"Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive.'" *Chanel, Inc.*, 362 F. Supp. 3d at 1262 (quoting 15 U.S.C. § 1114). "To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark, that its mark has priority, that the defendant used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264–65 (S.D. Fla. 1999); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1262 (consolidating those four elements into two: plaintiff "had prior rights to the mark at issue" and defendants "adopted a mark or name that was the same, or confusingly similar to" it "such that consumers were likely to confuse the two").

7

Registration of a mark with the USPTO is "prima facie evidence" of its "validity," "the registrant's ownership of" it, and "the registrant's exclusive right to use" it "in commerce" or "in connection with the goods or services specified in the registration." *See* 15 U.S.C. § 1115(a).  If a registered mark has been declared "incontestable" by the USPTO, *see id.* § 1065 (setting out the requirements for achieving incontestable status), "its validity is presumed, subject to certain enumerated defenses which are not applicable in this action," *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 328 (11th Cir. 1989); *see also* 15 U.S.C. § 1115(b).

A plaintiff's mark has priority if the plaintiff began using the mark before the defendant began using its competing mark.  *See PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1218 (S.D. Fla. 2004) (noting that plaintiff's mark had priority because it had been selling its products for five years before defendant created the competing domain names).  One way a defendant can use a mark in commerce is by "establishing a website on the Internet" that contains the mark.  *See id.*

"In determining the likelihood of confusion, the court must analyze the following seven factors: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion." *Carnival Corp.*, 74 F. Supp. 2d at 1265.  There are "four categories" of marks: generic; descriptive; suggestive; and "fictitious, arbitrary or fanciful." *See Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1540 (11th Cir. 1985) (citation omitted).  Generic marks can never achieve trademark status, descriptive marks are "protected only when secondary meaning is shown," suggestive marks are "comparatively weak" but "will be protected without proof of secondary meaning," and fictitious/arbitrary/fanciful marks are "generally inherently distinctive" and therefore "strong" and

"afforded the widest ambit of protection." *See id.* (citation omitted).  The Eleventh Circuit has held that a mascot "chosen by [a] university as a symbol for its athletic teams" is at minimum a suggestive mark but more likely an arbitrary mark. *See id.* at 1541 & n.16 (reaching this holding as to the University of Georgia's bulldog mascot and noting the Court saw "very little connection between the attributes of an English bulldog and, for example, the University of Georgia tennis team" or "the average University of Georgia football player").

Actual confusion is "reported instances of individuals who have actually become confused about the source of the services because of the similarities between the parties' trademarks." *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1360 (S.D. Fla. 1998). Plaintiff can show actual confusion in many ways, including with evidence of "consumer inquiries regarding possible affiliation between the parties," "attempts to purchase goods or services actually offered by the other party," "misdirected correspondence such as bills or letters," and misdirected phone calls. *See id.* Plaintiffs can also offer "survey evidence" and witness testimony. *See Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 845 (11th Cir. 1983).  "The strength of such evidence depends on the number of instances of confusion, the kinds of persons confused and the degree of confusion." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022) (quotation marks omitted).  The most important consideration is the type of person confused: if "consumers of the relevant product or service, especially the mark holder's customers," are confused, courts give that fact "substantial weight." *See id.* (quotation marks omitted).

"The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision.  The appropriate weight to be given to each of these factors varies with the circumstances of the case."

*Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citations omitted). "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit," *Dieter*, 880 F.2d at 326, but actual confusion "is obviously not a prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination," *Wreal, LLC*, 38 F.4th at 137. "In reviewing the evidence, there are no set rules as to how much evidence of confusion is needed; rather, a district court must take into consideration the circumstances surrounding each particular case." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir. 1997) (quotation marks omitted).

## 2. Federal Unfair Competition and False Designation of Origin (15 U.S.C. § 1125(a))

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks, even in the absence of federal trademark registration." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (alteration adopted, quotation marks omitted). "Section 43(a) is remedial in nature and should be interpreted and applied broadly so as to effectuate its remedial purpose." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001). "The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source." *Suntree Techs.*, 693 F.3d at 1346 (citation and emphasis omitted). "Common law and statutory trademark infringements are merely specific aspects of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193–94 n.5.

"To state a claim for unfair competition and false designation of origin, a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the

defendant made unauthorized use of it such that consumers were likely to confuse the two," *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1355–56 (S.D. Fla. 2012) (quotation marks omitted), which are the same elements required "to prevail on [a] federal claim of trademark infringement," *Suntree Techs.*, 693 F.3d at 1346.  *Cf. Chanel, Inc.*, 362 F. Supp. 3d at 1262 (explaining that the "test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim – i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue").  Because the "legal standard for unfair competition under both the Lanham Act and the common law has been held to be essentially the same as the standard for trademark infringement," courts "apply the same seven-factor 'likelihood of confusion' test to claims brought under 15 U.S.C. § 1125(a) as well as infringement claims." *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1284–85 (S.D. Fla. 2015).  A false designation of origin claim "proscribes the behavior of passing off or palming off, which occurs when a producer misrepresents his own goods or services as someone else's." *Custom Mfg.*, 508 F.3d at 647 (quotation marks omitted).

### 3.  Federal Trademark Dilution (15 U.S.C. § 1125(c))

"Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."  15 U.S.C. § 1125(c)(1).  "To establish a dilution claim, a plaintiff must provide sufficient evidence that (1) the mark is famous; (2) the alleged infringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the

defendant's use is commercial and in commerce."  *Brain Pharma*, 858 F. Supp. 2d at 1356 (quotation marks omitted).

"A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  *Id.* at 1357 (quotation marks omitted).  "To determine whether a mark is recognized by the public, courts consider factors such as (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."  *Id.*

"Trademark dilution claims[] are limited to truly famous marks such as Budweiser beer, Camel cigarettes, and Barbie dolls."  *Id.* (quotation marks omitted); *see also Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1286 ("To be famous in the context of a trademark dilution claim, the mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark; it must be truly prominent and renowned." (quotation marks omitted)); *Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1463 (S.D. Fla. 1998) (noting that "Congress has provided examples of marks constituting trade dilution: Dupont shoes, Buick aspirin, Kodak pianos" (quotation marks omitted)).  For that reason, it "is well-established that dilution fame is difficult to prove."  *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012).  "[F]ame for dilution is an either/or proposition—it either exists or does not" — and proving it requires a "stringent showing."  *See id.* (quotation marks omitted).

Being "distinctive in its particular market" is not enough "to engender immediate recognition in the general public."  *See Estefan Enters., Inc.*, 994 F. Supp. at 1463.  Instead, to

"establish the requisite level of fame, the mark's owner must demonstrate that the common or proper noun uses of the term" have been "eclipsed by the owner's use of the mark." *See Coach Servs., Inc.*, 668 F.3d at 1373 (quotation marks omitted). An owner "must show that, when the general public encounters the mark in almost any context, it associates the term, at least initially, with the mark's owner." *See id.* (quotation marks omitted).

### 4. Florida Common Law Trademark Infringement

"Courts may use an analysis of federal infringement claims as a measuring stick in evaluating the merits of state law claims of unfair competition." *Planetary Motion, Inc.*, 261 F.3d at 1193 n.4. Indeed, "analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1263 ("The analysis of liability for Florida common law trademark infringement is the same as the analysis of liability for trademark infringement under § 32(a) of the Lanham Act."); *cf. Custom Mfg.*, 508 F.3d at 652 (noting that a plaintiff's "failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law").

### C. Permanent Injunction and Attorney's Fees Standards in Trademark Cases

A district court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." *See* 15 U.S.C. § 1116(a). Indeed, injunctive relief "is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Burger*

CASE NO. 23-CV-23829-MARTINEZ/Elfenbein

*King Corp. v. Agad*, 911 F. Supp. 1499, 1509–10 (S.D. Fla. 1995) (quotation marks omitted).  In "ordinary trademark infringement actions complete injunctions against the infringing party are the order of the day.  The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks — even in cases in which more than one entity has a legal right to use the mark."  *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (alteration adopted, citation and quotation marks omitted).

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction."  *Id.* at 1208.  In "trademark cases, a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of a substantial threat of irreparable harm."  *Chanel, Inc.*, 362 F. Supp. 3d at 1263 (alteration adopted, quotation marks omitted).  In this Circuit, courts apply a "presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim" because "infringement by its nature causes irreparable harm."  *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1287 (S.D. Fla. 2010) (quotation marks omitted).  The same presumption applies when analyzing permanent injunctions, *id.* at 1287 n.4, because the "standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success," *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).

"[E]ven in a default judgment setting, injunctive relief is available."  *Chanel, Inc.*, 362 F. Supp. 3d at 1263.  In fact, a defendant's "failure to respond or otherwise appear . . . makes it

14

difficult for" a plaintiff "to prevent further infringement absent an injunction." *Id.* If a court determines that an injunction is warranted, its "broad equity powers allow it to fashion" whatever kind of injunctive relief is "necessary to stop" a defendant's "infringing activities." *Id.* at 1264.

In addition, the "court in exceptional cases may award reasonable attorney['s] fees to the prevailing party." 15 U.S.C. § 1117(a). While § 1117(a) does not define the term exceptional, the Eleventh Circuit has explained that "to be an exceptional case under the Lanham Act requires only that a case stands out from others, either based on the strength of the litigating positions or the manner in which the case was litigated."[3] *See Tobinick v. Novella*, 884 F.3d 1110, 1118 (11th Cir. 2018) (quotation marks omitted). Whether a particular case stands out from others is "to be left to the discretion of district courts, considering the totality of the circumstances." *See id.* at 1117.

## III.   DISCUSSION

As noted above, the University moves for both a final default judgment and a permanent injunction. *See* ECF No. [17]. Because injunctive relief is warranted only if Defendant has violated one or more of the University's trademark rights, *see, e.g.*, 15 U.S.C. § 1116(a); *Agad*, 911 F. Supp. at 1509–10, the Court first assesses whether the University is due a final default judgment on its infringement, unfair competition, false designation of origin, and dilution claims before evaluating whether it is entitled to a permanent injunction.

### A. Final Default Judgment

The University has already obtained a clerk's default, *see* ECF No. [13], so final default judgment is appropriate if there is a "sufficient basis" for it in the Complaint, *see Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245. A sufficient basis for default judgment exists if

---

[3] The University cites to caselaw indicating that the Eleventh Circuit defines "exceptional" as used in § 1117(a) to mean "malicious, fraudulent, deliberate, and willful." *See* ECF No. [17] at 14 (citing *PetMed Express, Inc.*, 336 F. Supp. 2d at 1222). But that caselaw — and thus, that definition — has since been abrogated. *See Tobinick*, 884 F.3d at 1117–18.

the Complaint states a claim to relief that is plausible on its face — that is, pleads factual content allowing the Court to draw the reasonable inference that Defendant is liable for trademark infringement, unfair competition, false designation of origin, or dilution.  *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  Of course, for Defendant to be liable for the claims against it, the University must have pleaded factual content establishing each element of those claims.

### 1. Federal Trademark Infringement (Count I)

Under § 1114, the University must show that: (1) it owns a valid trademark; (2) its mark has priority; (3) Defendant used the mark in commerce without its consent; and (4) Defendant's use is likely to cause consumer confusion.  *See Carnival Corp.*, 74 F. Supp. 2d at 1264–65; *Chanel, Inc.*, 362 F. Supp. 3d at 1262.  The University's well-pleaded factual allegations — which Defendant by its default has admitted are true, *see TracFone*, 196 F. Supp. 3d at 1298 — satisfy this standard.

First, the CANES Mark and the U Design Mark are valid trademarks.  The University has used the marks since 1965 and 1972 respectively, *see* ECF No. [1] at 3–4, and has used them in commerce since 1980 and 1972 respectively, *see* ECF No. [1] at 4–6; ECF No. [1-1]; ECF No. [1-2].  The marks have been advertised, promoted, used, sold, and worn worldwide for decades, *see* ECF No. [1] at 3–6, and often function as a shorthand reference for the University itself, *see* ECF No. [1] at 3.  The Court therefore agrees with the University that it owns common law trademark rights in the marks.  *See* ECF No. [1] at 4–5; *Surtain*, 789 F.3d at 1245 (noting that a defaulted defendant is not held to admit conclusions of law).  And because the marks have been registered with the USPTO since 1996 (for the CANES Mark) and 1993/2016 (for the U Design Mark), *see* ECF No. [1] at 4–6; ECF No. [1-1]; ECF No. [1-2], the University also has statutory trademark

rights in them, *see* 15 U.S.C. § 1115(a).  In fact, the USPTO has declared the marks incontestable, so their "validity is presumed."  *See Dieter*, 880 F.2d at 328; 15 U.S.C. § 1115(b).

Second, the CANES Mark and the U Design Mark have priority over the CANEUP Mark. The University has been using the CANES Mark since 1965/1980 and the U Design Mark since 1972, and it has held USPTO registration for the CANES Mark since 1996 and for the U Design Mark since 1993/2016.  *See* ECF No. [1] at 4–6; ECF No. [1-1]; ECF No. [1-2].  Defendant started using the CANEUP Mark in 2014 and filed its USPTO registration application in 2021.  *See* ECF No. [1] at 7–12; ECF No. [1-3].  Thus, the University was using its marks for at least 34 years before Defendant started using the CANEUP Mark and held registrations for them at least 5 years before Defendant filed to register the CANEUP Mark.  *See* ECF No. [1] at 3–12; ECF No. [1-1]; ECF No. [1-2]; ECF No. [1-3].  That is all that is required for the University's marks to have priority.  *See PetMed Express, Inc.*, 336 F. Supp. 2d at 1218.

Third, Defendant used the CANEUP Mark in commerce without the University's consent. When Defendant filed its registration application with the USPTO, products branded with the CANEUP Mark could be found on a website, *see* ECF No. [1] at 7–12; ECF No. [1-3], which is one way to use a mark in commerce, *PetMed Express, Inc.*, 336 F. Supp. 2d at 1218.  And certainly, the University's opposition to Defendant's USPTO registration application, its cease-and-desist letter, and this lawsuit demonstrate that it has not consented to Defendant's use of the CANEUP Mark.  *See* ECF No. [1]; ECF No. [1-4]; ECF No. [6] at 2; ECF No. [6-3]; ECF No. [17].

Fourth and finally, Defendant's use of the CANEUP Mark is likely to cause consumer confusion.  Looking to the factors that determine likelihood of confusion, *Carnival Corp.*, 74 F. Supp. 2d at 1265, the Court finds that the CANES Mark falls into the fictitious/arbitrary/fanciful category, *see Laite*, 756 F.2d at 1540.  An arbitrary mark is a "word or phrase that bears no

relationship to the product." *Fla. Int'l Univ. Bd. of Trustees*, 91 F. Supp. 3d at 1274–75.  Like the University of Georgia Bulldog mascot, the CANES Mark is a symbol the university chose for its educational institution that has "very little connection" to the institution or its athletic program. *See id.* at 1541 & n.16.  While hurricanes do have a connection to South Florida, where the University is located, the Eleventh Circuit has noted that level of linkage is not enough to downgrade a mark to descriptive or generic status.  *See id.*  Indeed, a hurricane bears no relationship to the product offered by the University — a college education.  *See Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 671 (W.D. Tex. 2008) ("UT's longhorn silhouette logo is a fanciful or arbitrary mark . . .; a longhorn silhouette is no way descriptive of UT's educational enterprise.") (internal citations omitted).  As a result, the CANES Mark deserves a higher level of protection.  *See id.* at 1540.

The similarity of the marks is apparent after even a quick comparison of the CANES Mark and the U Design Mark with the CANEUP Mark.[4]  *Carnival Corp.*, 74 F. Supp. 2d at 1265.  As the University points out, both the CANES Mark and the CANEUP Mark are predominantly made up of the word "CANE," which — to sports fans at least — is heavily and instantly associated with the University.  *See* ECF No. [1] at 3–4, 7.  The same is true about the U Design Mark, which has been featured on the University's athletic uniforms for decades and in front of millions.  *See* ECF No. [1] at 3–4, 7.  And as shown in the pictures of the CANEUP Mark in use, many of the renderings of that mark mimic the orange and green color scheme and the internal split of the U Design Mark.  *See* ECF No. [1] at 4, 7–10; ECF No. [17] at 7, 10–13.

The similarities do not end there.  Both the University's marks and the CANEUP Mark are used on the same kind of products (clothing and apparel), available through the same retail outlets

---

[4] The University includes pictures of the three marks, including side-by-side comparisons, in the Complaint and the Motion.  *See* ECF No. [1] at 4, 7–10; ECF No. [17] at 7, 10–13.

(websites), offered to the same purchasers (people who want to wear clothing bearing the word "CANE," an orange-and-green U, or both), and advertised in the same way (online).  *See Carnival Corp.*, 74 F. Supp. 2d at 1265; ECF No. [1] at 3–12; ECF No. [17] at 5–15.  As to Defendant's intent, *see Carnival Corp.*, 74 F. Supp. 2d at 1265, the admitted allegations of the Complaint establish that it "intentionally" adopted the CANEUP Mark "with disregard for the University's rights in its marks" to "capitalize on the intellectual property rights of the University," *see TracFone*, 196 F. Supp. 3d at 1298; ECF No. [1] at 11.  Even beyond that factual admission, Defendant's own communications demonstrate that it had the University — and its CANES/U Design Marks — "in mind" when developing the CANEUP Mark.  *See* ECF No. [1] at 12.

While six of the seven factors favor the University, the seventh — actual confusion — does not.  *See Carnival Corp.*, 74 F. Supp. 2d at 1265.  The University has not alleged, and therefore Defendant has not been deemed to have admitted, that anyone actually confused the CANEUP Mark with the CANES Mark or the U Design Mark.  *See generally* ECF No. [1].  The closest the University comes are allegations that the CANEUP Mark is "confusingly similar" and "likely to cause confusion" such that "consumers are likely to be misled, deceived and confused as to the origin, sponsorship, or affiliation of Defendant's clothing products."  ECF No. [1] at 7, 11–17, 19.

Nonetheless, actual confusion is not required.  Although that factor is one of the two most important in this Circuit (the other being the type of mark), *see Dieter*, 880 F.2d at 326, whether it exists is simply part of the weighing and balancing the Court undertakes in the likelihood-of-confusion determination, *see Wreal, LLC*, 38 F.4th at 137; *Suntree Techs., Inc.*, 693 F.3d at 1346.  The Court must decide the issue based on the "circumstances surrounding each particular case." *Longhorn Steaks, Inc.*, 122 F.3d at 1382 (quotation marks omitted).

On balance, the six factors in the University's favor outweigh the one factor in Defendant's

favor.  As to the CANES Mark, it is a type of mark given the most protection, nearly identical to the CANEUP Mark, used on the same kind of products as the CANEUP Mark, available through the same retail outlets as the CANEUP Mark, offered to the same purchasers as the CANEUP Mark, and advertised in the same way as the CANEUP Mark.  In addition, by Defendant's admissions and its own words, it intended that the CANEUP Mark bring to mind the University and become a new University slogan.  Under the circumstances of this case, even in the absence of evidence of actual confusion, the Court finds that the CANEUP Mark is likely to cause consumer confusion with the CANES Mark.  *See Carnival Corp.*, 74 F. Supp. 2d at 1265; *Suntree Techs., Inc.*, 693 F.3d at 1346; *Longhorn Steaks, Inc.*, 122 F.3d at 138.

The analysis is only slightly different as to the U Design Mark.  Because it is also an arbitrary mark in that the mark — an orange-and-green U with a split design — has no relationship to the product — a college education, the U Design Mark deserves a higher level of protection.  *See Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin*, 550 F. Supp. 2d at 671 (finding that longhorn silhouette was an arbitrary mark because it had no relationship to the educational institution at the University of Texas).  While the U Design Mark is not nearly identical to the CANEUP Mark like the CANES Mark is, many of the products bearing the CANEUP Mark show that mark rendered in orange and green with a white stripe separating the two colors or containing a stylized depiction of the letter "U" in orange, green, and white.  *See* ECF No. [1] at 8–10; ECF No. [1-3] at 5, 9.  The split in the CANEUP Mark is reminiscent of the split in the U Design Mark, as is the orange, green, and white color scheme — particularly when those colors are gradated within the "U" of the CANEUP Mark, emphasizing that letter just as the U Design Mark does.  Thus, the fact that this one factor is slightly less favorable to the University as to the U Design Mark than it is as to the CANES Mark does not tip the scales toward Defendant.  Under

the circumstances of this case, the Court finds that the CANEUP Mark is also likely to cause consumer confusion with the U Design Mark. *See Carnival Corp.*, 74 F. Supp. 2d at 1265; *Suntree Techs., Inc.*, 693 F.3d at 1346; *Longhorn Steaks, Inc.*, 122 F.3d at 138.

Having met all four elements of federal trademark infringement under § 1114, the University has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. As a result, the University is entitled to final default judgment on Count I. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 2. Federal Unfair Competition and False Designation of Origin (Count II)

Under § 1125(a), the University must show that: (1) it has enforceable trademark rights in the CANES Mark and the U Design Mark, and (2) Defendant made unauthorized use of those marks such that consumers were likely to confuse them with the CANEUP Mark. *See Brain Pharma*, 858 F. Supp. 2d at 1355–56. Although described in two elements instead of four, those requirements are the same ones needed for a plaintiff to prevail on a federal claim of trademark infringement. *See Suntree Techs.*, 693 F.3d at 1346; *Chanel, Inc.*, 362 F. Supp. 3d at 1262; *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85. The only real difference between a claim under § 1114 and a claim under § 1125(a) is that relief is available for unregistered marks under § 1125(a) but not under § 1114. *See Custom Mfg.*, 508 F.3d at 647.

But that difference does not change the likelihood-of-confusion analysis, because the "legal standard for unfair competition" is "essentially the same" as the one for trademark infringement. *See Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1284–85. For that reason, the Court's findings in its analysis of Count I, *see supra* Section III.A.1, apply just as strongly to Count II. Thus, the Court finds that the University has enforceable trademark rights in the CANES Mark and the U

Design Mark and that Defendant made unauthorized use of those marks such that consumers were likely to confuse them with the CANEUP Mark. *See Brain Pharma*, 858 F. Supp. 2d at 1355–56.

Having met both elements of federal unfair competition and false designation of origin under § 1125(a), the University has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41. As a result, the University is entitled to final default judgment on Count II. *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 3.   Federal Trademark Dilution (Count III)

Under § 1125(c), the University must show that the CANES Mark and the U Design Mark are famous, Defendant adopted the CANEUP Mark after the CANES Mark and the U Design Mark became famous, Defendant diluted the CANES Mark and the U Design Mark, and Defendant's use of the CANEUP Mark is commercial and in commerce. *See Brain Pharma*, 858 F. Supp. 2d at 1356. For the CANES Mark and the U Design Mark to be famous, they must be widely publicly recognized as a designation of the University's goods or services. *See id.* at 1357. That analysis generally requires an inquiry into the University's advertising and publicity of the CANES Mark and the U Design Mark, its sales of goods or services under the marks, the extent of actual recognition of the marks, and whether the marks are registered with the USPTO, but courts in this District have recognized that successful trademark dilution claims are limited to truly famous marks. *See id.* (giving as examples Budweiser beer, Camel cigarettes, and Barbie dolls).

The University alleges that the CANES Mark and the U Design Mark "have become famous" by "virtue of significant use, advertisement, and promotion." *See* ECF No. [1] at ¶73. But that is a legal conclusion, not a factual allegation. *See Brain Pharma*, 858 F. Supp. 2d at 1356 (listing as an element of a federal trademark dilution cause of action whether the mark is famous).

And despite its default, Defendant is not deemed to have admitted legal conclusions.  *See Surtain*, 789 F.3d at 1245; *Chanel, Inc.*, 362 F. Supp. 3d at 1259.  Thus, the Court must decide whether it agrees with the University's assessment of its marks' fame.  It does not.

While there is little doubt that the CANES Mark and the U Design Mark are well-known and well-recognized to *sports fans* throughout the United States — and might even be Barbie-level famous *in South Florida* — these marks are not "truly prominent and renowned" nationwide in the way Budweiser beer is.  *See Brain Pharma*, 858 F. Supp. 2d at 1357; *Fla. Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1286.  The measure of dilution fame is not limited by market or geography, so the renown of the CANES Mark and the U Design Mark to supporters of collegiate athletics and the fervor for the marks in Florida are not enough to lift the marks to the notoriety of Kodak or Buick.  *See Estefan Enters., Inc.*, 994 F. Supp. at 1463.  Indeed, niche market fame in the area of athletics does not equal a presence with the general consuming public, which is nearly the entire population of the United States.  By way of example, in *Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin*, 550 F. Supp. 2d at 678, the University of Texas pursued a claim of trademark dilution of its trademarked longhorn silhouette logo.  The district court, analyzing the evidence the University of Texas submitted in support of its dilution claim, concluded that it was "evidence of 'niche' fame," which is a category of fame to which § 1125(c) does not apply.  *Id.* Evidence that the University of Texas's football games are regularly televised on a nationwide basis prominently featuring the longhorn silhouette logo, that the men's college basketball team's games were televised 97 times over five seasons, that 35 million spectators watched the Bowl Championship Series Rose Bowl or 9 million spectators watched the Alamo Bowl in which the University of Texas football team played, that University of Texas football players were featured on the cover of Sports Illustrated repeatedly between 1963 and 2006, that the Collegiate Licensing

Company reported it holds the record for most royalties earned in a single year, that *Forbes* valued

its football program as the second most valuable in the country, and that retail sales of its products

in stores, such as Wal-Mart and Target totaled nearly $400 million from 2005 to 2006, among

other evidence, all related to "niche fame" but was not evidence that the mark was "widely

recognized by the general consuming public of the United States." *Id.*  The district court reasoned

that, based on this evidence, "it is not at all clear that if one is not a college football fan (or, to a

much lesser extent, college baseball or basketball fan) would recognize the [longhorn silhouette

logo] as being associated with the [University of Texas], as all of the evidence relates to the use of

the logo in sporting events." *Id.*  The popularity of the University of Texas's athletic program did

"not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe

with Buick or KODAK." *Id.*

As explained above, trademark dilution under § 1125(c) is restricted to "those few truly

famous marks like Budweiser beer, Camel cigarettes, Barbie Dolls, and the like." *Id.* (internal

citations omitted).  Here, the allegations in the Complaint do not establish that the University's

marks are a household name across the United States.  Rather, much like the evidence used to

support the trademark dilution claim involving the University of Texas longhorn silhouette logo,

the allegations here focus almost exclusively on the prominence of the University in the area of

collegiate athletics.  The Complaint alleges that "the University has been a member of the Atlantic

Coast Conference, which participates in the National Collegiate Athletic Association ('NCAA')

Division I" since 2004, and "[p]rior to 2004, most of the University's athletic teams competed in

the Big East Conference."  ECF No. [1] at ¶7.  It further alleges that "[t]he University's athletic

teams have enjoyed tremendous success, winning twenty-one team National Championships in

various sports," specifically highlighting the successes of its football and baseball teams.  *Id.*  For

example, the Complaint alleges that "[t]he University's football team has won five National Championships and dozens of the University's football players have gone on to excel in the National Football League, with nine having been inducted into the Pro Football Hall of Fame as of 2023" while "[t]he University's baseball team has won four National Championships and has reached the College World Series twenty-two times since 1974," holding "the NCAA record for the most consecutive post season appearances" — "the longest [streak] of any major NCAA Division I men's sport." *Id.* It further alleges that "[a]s a result of the University's success and the University's athletic teams, the CANES Mark and the U design mark have been extensively featured on television broadcasts and in print and online media nationwide and around the world for decades," but the example given for such nationwide and worldwide "promotion of the CANES Mark and the U Design Mark" is once again tied to the area of sports — "the University men's basketball team play[ing] in the NCAA Final Four competition held in Houston, Texas in March 2023." *Id.* at ¶10. Adding to its claims of promotion of the marks, the University alleges it "has fifteen varsity sports teams for seventeen varsity sports, all of which are referred to and identified by the CANES Mark and the U Design Mark," again reiterating the success of its teams "winning twenty-one team National Championships in various sports." *Id.* at ¶11. And, in conclusory fashion, the Complaint then alleges that "[b]y virtue of decades of use and the widespread sales and extensive advertising, promotion and sale of the products and services identified by the U Design Marks and the CANES® Mark, the U Design Marks and the CANES® Mark have become well-known among the general public and are recognized and relied upon as identifying the University's products and services and as distinguishing them from the products and services of others, and have come to represent and symbolize extremely valuable goodwill belonging exclusively to the University." *Id.* at ¶21. Yet, the Complaint does not identify how the marks

have become "well-known among the general public" across the United States as opposed to its fan base, its alumni, and those interested in the world of collegiate athletics.

Although the CANES Mark and the U Design Mark are somewhere on the spectrum of famous, fame for dilution either exists or does not. *See id.*  In the context of this case, the Court finds that it does not as there are no allegations of widespread fame across the general population of the United States, only niche fame.  *See id.*  Dilution fame is difficult to prove and requires a stringent showing that the University has not made here.  *See id.*  Because the University has not met the elements of federal trademark dilution under § 1125(c), *Brain Pharma*, 858 F. Supp. 2d at 1356, the University has failed to state a claim to relief that is plausible on its face, *Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, the University is not entitled to final default judgment on Count III.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*, 789 F.3d at 1245.

### 4.  Florida Common Law Trademark Infringement (Count IV)

Courts use the same analysis to evaluate Florida common law trademark infringement claims as they do to evaluate federal trademark infringement claims.  *See TGC, Inc.*, 329 F.3d at 802; *Chanel, Inc.*, 362 F. Supp. 3d at 1263.  For that reason, the Court's findings in its analysis of Count I, *see supra* Section III.A.1, apply also to Count IV.  Because the University met all four elements of federal trademark infringement, the Court finds that it has also satisfied the standard for its Florida common law trademark infringement claim.

Having satisfied the standard for its Florida common law trademark infringement claim, the University has stated a claim to relief that is plausible on its face. *See Iqbal*, 556 U.S. at 678; *Surtain*, 789 F.3d at 1245; *Chudasama*, 123 F.3d at 1370 n.41.  As a result, the University is entitled to final default judgment on Count IV.  *See Chanel, Inc.*, 362 F. Supp. 3d at 1259; *Surtain*,

789 F.3d at 1245.

Accordingly, I **RECOMMEND** that final default judgment to the University be **GRANTED as to Counts I, II, and IV** but **DENIED as to Count III**.

### B. Permanent Injunction[5]

The University has shown it is entitled to final default judgment on Counts I, II, and IV, *see supra* Section III.A, so the Court must now decide whether a permanent injunction against Defendant is the appropriate remedy, *see* 15 U.S.C. § 1116(a). As an initial matter, the Court notes that injunctive relief is available in the default judgment setting — particularly in the trademark context — because a defendant's failure to respond or otherwise appear makes it difficult for a plaintiff to prevent further infringement without an injunction. *See Chanel, Inc.*, 362 F. Supp. 3d at 1263; *Agad*, 911 F. Supp. at 1509–10.

To prove a permanent injunction is warranted here, the University must demonstrate that it has suffered irreparable harm, remedies like money damages are inadequate, the balance of hardships favors awarding the University equitable relief, and a permanent injunction would not disserve the public interest. *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208. Because the University has succeeded on its trademark infringement claim, the Court presumes it has been irreparably harmed, which means the University has satisfied the first element of the permanent injunction test. *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 & n.4; *Amoco Prod. Co.*, 480 U.S. at 546 n.12. And courts in this District have already held there is no adequate remedy at law

---

[5] While the University sought money damages in its Complaint, *see* ECF No. [1] at 14–19, it explicitly states in the Motion that it "seeks only the entry of a Default Final Judgment awarding a permanent injunction preventing further infringement" because it "lacks the discovery necessary to calculate" Defendant's "improper profits from the sale" of "goods bearing" the CANEUP Mark "and statutory damages are not available for the claims" it asserts, *see* ECF No. [17] at 1–2 n.1. For that reason, the Court does not decide whether the University is entitled to money damages or the amount to which it may be entitled.

for the injury caused by a defendant's continuing infringement, so the University has satisfied the second element of the permanent injunction test as well.  *See Agad*, 911 F. Supp. at 1509–10.

As to the balance of hardships, the University stands to lose the "extremely valuable goodwill" and "reputation" attached to the CANES Mark and the U Design Mark, *see* ECF No. [1] at 7, 14–18, if consumers believe Defendant's products are associated with the University and decide they are "unpalatable."  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1287 (explaining that confused consumers who buy the infringing product and are unsatisfied with it "might stop purchasing the original" product, which would leave the mark's owner "at the mercy" of the infringer because it had "no control over the quality" of the infringing product).  Defendant, on the other hand, has no right to use the CANES Mark and the U Design Mark — or the confusingly similar CANEUP Mark — so it "could suffer no legitimate hardship by being forced to stop that which it had no right to do."  *See id.* at 1288.  Thus, the balance of hardships favors the University, and it has satisfied the third element of the permanent injunction test.  *See id.*

Finally, the Eleventh Circuit has explained that the public interest relevant to the issuance of a permanent injunction is "the public's interest in avoiding unnecessary confusion."  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1209.  It has also noted "the public deserves not to be led astray" by inevitably confusing marks, which is why a "complete injunction" against an infringer is "the order of the day" in "ordinary trademark infringement actions."  *See id.* (quotation marks omitted).  And courts in this District have concluded "the public as a whole has a paramount interest not to be confused" by a defendant's infringement.  *See Tiramisu Int'l LLC*, 741 F. Supp. 2d at 1288 (quotation marks omitted).  Measured against those principles, the Court finds that preventing Defendant from using the CANEUP Mark  best serves the public interest because products bearing the CANEUP Mark will likely cause consumer confusion.  *See supra* Section III.A.1.

The University has satisfied all four prongs of the permanent injunction test.  *See Angel Flight of Ga., Inc.*, 522 F.3d at 1208.  Accordingly, I **RECOMMEND** that a permanent injunction **BE ISSUED** against Defendant prohibiting it from using the CANEUP Mark.  *See* 15 U.S.C. § 1116(a); *Chanel, Inc.*, 362 F. Supp. 3d at 1264 (noting that a court's broad equity powers allow it to fashion whatever kind of injunctive relief is necessary to stop a defendant's infringing activities**).**

### C. Attorney's Fees

The University contends that this "amounts to an exceptional case, justifying an award of" attorney's fees under 15 U.S.C. § 1117(a).  *See* ECF No. [1] at 14–18.  And the University is correct that the Court can award reasonable attorney's fees to the prevailing party in exceptional cases.  *See* 15 U.S.C. § 1117(a).  A case is exceptional if, after considering the totality of the circumstances, the Court concludes it stands out from others based on the strength of the litigating positions or the manner in which it was litigated.  *See Tobinick*, 884 F.3d at 1117–18.

Under the particular circumstances of this case, the Court finds that an award of attorney's fees is not warranted.  Nothing about this case makes it stand out from other trademark infringement actions.  Defendant has not litigated the case in a manner that made it more difficult or expensive for the University, as other parties against whom attorney's fees have been awarded have done.  *See id.* at 1118–19.  In fact, Defendant has not litigated this case at all.  While Defendant's failure to litigate meant the University had to attempt to serve it eleven times and eventually use an alternative form of service, *see* ECF No. [6] at 2; ECF No. [9]; ECF No. [10]; ECF No. [11], such a situation is likely not unusual in trademark infringement actions given that mark owners can often obtain default judgments against infringers, as the University has done here, *see Chanel, Inc.*, 362 F. Supp. 3d at 1263.

Similarly, though the litigating positions are imbalanced, and the University certainly had the stronger side, the imbalance is not so great as to make this case exceptional. *See Tobinick*, 884 F.3d at 1117–18. One of the most important factors in the likelihood of confusion analysis — actual confusion — favors Defendant, *see supra* Section III.A.1, and the University did not succeed on all of its claims, *see supra* Section III.A.3. While the $24,852.00 in attorney's fees the University has spent to litigate this case so far, *see* ECF No. [17] at 16, is not insignificant, it is also not out of the ordinary. As in most cases, the University's litigation expenses here are simply the cost of doing business.

Accordingly, I **RECOMMEND** that the University's request for attorney's fees be **DENIED**.

## IV.  CONCLUSION

Accordingly, I respectfully **RECOMMEND** that Plaintiff University of Miami's Motion for Default Final Judgment and Permanent Injunction Against Defendant, CANEUP LLC, **ECF No. [17]**, be **GRANTED in part** and **DENIED in part** as follows:

1. As to **Counts I, II, and IV**, I recommend that final default judgment be **GRANTED**, but as to **Count III**, I recommend that a final default judgment be **DENIED**;

2. A permanent injunction **BE ISSUED** against Defendant prohibiting it from using the CANEUP Mark; and

3. The University's request for attorney's fees be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of

CASE NO. 23-CV-23829-MARTINEZ/Elfenbein

an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on October 15, 2024.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record

Caneup LLC
C/O Philip Rose Registered Agent
50 Farnham C
Deerfield Beach, FL 33442
*PRO SE*